Filed 5/11/22 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| SKY POSTERS INC.,<br><br>  Plaintiff and Appellant,<br><br>  v.<br><br>DEPARTMENT OF TRANSPORTATION,<br><br>  Defendant and Respondent. | B304897<br><br>(Los Angeles County Super. Ct. No. BS173417)<br><br>ORDER MODIFYING OPINION<br><br>NO CHANGE IN APPELLATE JUDGMENT |

THE COURT:

The above-entitled opinion filed on May 10, 2022 is modified as follows:

On page 1, add the following attorney information below paragraph 3:

Kane Ballmer and Berkman, Royce K. Jones and Bruce C. Gridley for City of Inglewood, as Amicus Curiae on behalf of Petitioner and Appellant.

There is no change in the appellate judgment.

PERLUSS, P.J.          SEGAL, J.          FEUER, J.

Filed 5/10/22 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| SKY POSTERS INC., | B304897 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BS173417) |
| v. | |
| DEPARTMENT OF TRANSPORTATION, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James C. Chalfant, Judge. Reversed and remanded with directions.

Gary S. Mobley for Plaintiff and Appellant.

Erin E. Holbrook, Chief Counsel, Jerald M. Montoya, Deputy Chief Counsel, and Alexander Prieto for Defendant and Respondent.

———————————————

Sky Posters, Inc. appeals from a judgment entered after the trial court denied in part its petition for writ of administrative mandate pursuant to Code of Civil Procedure section 1094.5. In 2014 the California Department of Transportation (Caltrans) issued notices to Sky Posters alleging violations of the Outdoor Advertising Act (Bus. & Prof. Code,[1] § 5200 et seq.; OAA) in connection with two large advertising displays Sky Posters erected on the walls of a 12-story office building adjacent to Interstate 405 in Inglewood. A 30,000-square-foot display advertised a new Nissan Rogue, and a 25,000-square-foot display advertised an X-Men movie. Each display contained a 100-square-foot tagline at the bottom of the advertising copy stating the products were available at a specified business location. After a formal hearing, the administrative law judge issued a proposed decision affirming the violations and imposing penalties. Caltrans adopted the proposed decision as its final decision, and the trial court upheld the portion of the decision sustaining the violations.

Sky Posters contends the advertising displays were lawful under sections 5272 and 5273, which together exempt advertising displays located within a redevelopment project area (redevelopment displays)[2] from the OAA as on-premises displays if they advertise businesses conducted, services provided, or goods sold or manufactured within the project area and meet other specified requirements. The administrative law judge and

---

[1]    Undesignated statutory references are to the Business and Professions Code.

[2]    We refer to advertising displays that qualify as "on-premises" displays under section 5273 as redevelopment displays.

2

the trial court found these exemptions did not apply to the Sky Posters advertising displays because the business location taglines on the displays were visually dwarfed by the advertising copy for the products[3] purportedly available at those businesses (one display showed a photograph of a 2015 Nissan Rogue; the other showed images of characters from the X-Men film franchise).  The ALJ and trial court concluded it was clear from the totality of the circumstances the displays advertised the products, not the redevelopment-area businesses, to passing motorists.

We conclude the administrative law judge and the trial court applied erroneous legal standards in determining the displays were not authorized under sections 5272 and 5273.  In view of the legislative history of section 5273 and the Caltrans regulations interpreting the section, a redevelopment display qualifies as an on-premises display exempt from the OAA's requirements under sections 5272 and 5273 if it advertises goods or services that are not incidental or secondary to the principal business activity of a business within the redevelopment project area, provided the business location tagline complies with minimum size standards set forth in section 5273, subdivision (d).[4]  Nowhere in the statute or Caltrans's implementing regulations is there an additional requirement that the business location tagline not be "visibly dwarfed" by the advertising copy for the goods or services advertised.  We reverse the judgment

---

[3]      We use the terms "goods" and "products" interchangeably.

[4]      The advertising display must also satisfy requirements for approval, local business identification, and certification set forth in section 5273, subdivisions (a) through (d).

and remand with instructions for the trial court to enter a writ of administrative mandate directing Caltrans to vacate the administrative decision and to direct the administrative law judge to make findings under the correct legal standard.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Statutory Framework*

The OAA governs the placement of off-premises advertising displays within 660 feet of and visible from interstate highways and other primary highways.  (§§ 5270, 5271, 5405.)  The OAA generally prohibits anyone from placing an advertising display without securing a written permit from Caltrans (§ 5350) and paying a license fee (§ 5301).  The law further restricts displays adjacent to landscaped highways (§ 5440).  However, the OAA does not apply to an "on-premises" advertising display, which includes a display used exclusively to advertise "business conducted, services rendered, or goods produced or sold upon the property on which the advertising display is placed."  (§ 5272, subd. (a)(4); see § 5442, subd. (c) [requirements for advertising display adjacent to landscaped highways do not apply to advertising display used exclusively "[t]o advertise goods manufactured or produced, or services rendered, on the property upon which the advertising display is placed"].)  On-premises advertising displays are governed by a separate chapter of the Business and Professions Code, which contains fewer restrictions. (See §§ 5490-5499.)

In 1985 the Legislature enacted former section 5273 of the OAA, providing that "advertising displays advertising those businesses and activities developed within the boundary limits of,

and as part of, an individual redevelopment agency project may, with the consent of the redevelopment agency governing the project, be considered to be on the premises anywhere within the limits of that project . . . ." (Stats. 1985, ch. 1448, § 1, p. 5144.)

In 2013 the Legislature enacted Senate Bill No. 684 (2013-2014 Reg. Sess.) (Stats. 2013, ch. 544, § 1, p. 2) (Senate Bill 684), which amended section 5273 following the dissolution of state redevelopment agencies to provide additional requirements for redevelopment displays in place of the former provision for consent of the redevelopment agency. As amended, section 5273, subdivision (a), now provides, "Notwithstanding the dissolution of a state redevelopment agency . . . an advertising display advertising the businesses and activities developed within the boundary limits of, and as part of, an individual redevelopment agency project, as those boundaries existed on December 29, 2011, may continue to exist and be considered an on-premises display" if, in relevant part, the display was constructed on or before January 1, 2012 and is located within a redevelopment project area. (§ 5273, subd. (a)(1)-(2).)

Amended section 5273, subdivision (c), provides, "The applicable city, county, or city and county shall be responsible for ensuring that [a redevelopment display] is consistent with this section and provides a public benefit."[5] Amended section 5273, subdivision (d), requires the local governmental entity annually to "certify to [Caltrans] that the advertising copy of the advertising display is advertising businesses or activities operating within the boundaries of the redevelopment project

---

[5]     Section 5273, subdivision (c), further states, "This provision shall not be construed to preclude any enforcement authority of [Caltrans] under [the OAA]."

area and that at least 10 percent of the advertising copy, up to a maximum of 100 square feet, is used to display the address or location or locations of the business or activity, or to identify the route to the business or activity from the nearest freeway offramp." Caltrans "may independently review compliance with this certification." (*Ibid.*)

B.    *Sky Posters's Inglewood Advertising Displays*[6]

The advertising displays at issue are two very large vinyl advertising displays affixed to the walls of a 12-story office building at 9800 South La Cienega Boulevard in Inglewood (the building). Michael McNeilly, Sky Posters's president, testified the displays are "some of the largest murals in the country." The building abuts Interstate 405, and the displays are visible from the freeway. The building is within the boundaries of the Merged Inglewood Redevelopment Project Area.

In 2010 Sky Posters entered a revenue-sharing agreement with the City of Inglewood (City) to place advertising displays approved by the Inglewood Redevelopment Agency on three faces of the building (as well as on an adjacent parking garage), with the City to receive 25 percent of gross advertising revenues. The agreement was subsequently amended to address the dissolution of the redevelopment agency, and under the amendment the City would receive 40 percent of gross revenues. The agreement specified that before installing or changing the advertising copy on the displays, Sky Posters was required to submit the proposed

---

[6]    The background facts are taken from the testimony at the administrative hearing and the administrative law judge's statement of decision. Other than where indicated, the facts are not in dispute.

advertising copy and display specifications for City approval. In 2010 Sky Posters obtained written approval from Caltrans to place redevelopment displays on the building.[7]

On December 19, 2013 Sky Posters applied for and obtained a building permit from the City to place an advertisement it described as "'Nissan'" on the south and east faces of the building, commencing on January 1, 2014 (the Nissan display). Sky Posters's contractor installed a 30,000 square foot vinyl display—100 feet tall and 300 feet wide—over two faces of the building. The advertising copy on each face stated, "The all-new Nissan Rogue" and "Enjoy missing your next exit" in large letters next to a large Nissan logo. (Capitalization omitted.) The lion's share of the advertisement comprised a photograph of a 2015 model year Nissan Rogue. At the bottom corner of the display on one of the building walls, a 100-square-foot location tagline appears to state, "Nissan Available at CarMax 3471 W. Century Blvd Inglewood CA 90303[.]"[8]

---

[7]     A party seeking to install a redevelopment display must file a permit application with Caltrans demonstrating compliance with section 5273, subdivision (a); however, once the application has been approved, the display "shall be considered an on-premise display and no permit will issue." (Cal. Code Regs., tit. 4, § 2244.) Thereafter, the local government agency is responsible for annually certifying to Caltrans that the redevelopment display complies with section 5273, subdivision (a). (§ 5273, subds. (d) & (e).)

[8]     The words on the location tagline on the Nissan display are barely visible from the exhibit in the administrative record. We cannot tell the extent to which the words would be visible to someone driving by the sign. Further, the tagline provided an inaccurate address for the CarMax facility. The hearing exhibits

On April 16, 2014 Sky Posters filed for and obtained a building permit to place advertising it described as "'X Men'" on the north face of the building commencing April 17, 2014 (the X-Men display). The X-Men display was 25,000 square feet—100 feet tall and 250 feet wide. The advertisement comprised large images of four characters from the "X-Men" film franchise, and printed across the bottom in large letters was the following: "X-Men Days of Future Past" and "May 23[.]" (Capitalization omitted.) At the bottom corner of the display, a 100-square-foot location tagline stated, "Tickets Available @ Inglewood Tickets, Located at 128 S. Market St., Inglewood CA[.]"

C.    *The Notices of Violation*

On April 28, 2014 Caltrans issued separate violation notices to Sky Posters for the Nissan and X-Men displays. Other than the description of the displays, the notices were identical and alleged the following OAA violations: failure to obtain a permit to place advertising (§ 5350); failure to pay an outdoor advertising license fee (§ 5301); failure to submit proof of the property owner's consent (§§ 5354, 5460); placement of an advertising display adjacent to a landscaped freeway (§ 5440); placement of advertising displays that do not advertise businesses or activities in a redevelopment zone (§ 5273); and violation of sign spacing requirements (§ 5408, subd. (a)). Sky Posters timely appealed both notices and requested a formal

indicate the Inglewood CarMax is located at 8611 La Cienega Boulevard. We take judicial notice that this address is at least two miles from the address printed on the Nissan display. However, Caltrans does not argue on appeal that use of an incorrect address rendered the Nissan display unlawful.

hearing pursuant to California Code of Regulations, title 4, section 2241, and Government Code section 11500.

Caltrans filed an accusation alleging the same violations with a prayer for removal of the displays, as well as an assessment of penalties and disgorgement of revenues under section 5485, subdivisions (b) and (c).[9] Sky Posters filed a notice of defense, objecting on the grounds the accusation was vague and did not state grounds for agency action, and asserting 13 affirmative defenses.

The Nissan display was removed around May 24, 2014, and the X-Men display was removed around May 31, 2014. The City received approximately $52,000 from gross revenues for the X-Men display; there is no evidence in the record how much the City received for the Nissan display.

Sky Posters continued, with City permits, to place advertisements on the building walls at least through July 2015, including 19 movie advertisements and one vehicle advertisement. According to Inglewood Mayor James Butts, the City's agreement with Sky Posters generated more than

---

[9] Section 5485, subdivision (b)(2), provides, "If the advertising display is placed or maintained in a location that does not conform to the provisions of this chapter or local ordinances, and is not removed within thirty days of written notice from [Caltrans or the local governmental entity] . . . , a penalty of ten thousand dollars ($10,000) plus one hundred dollars ($100) for each day the advertising display is placed or maintained after [Caltrans] sends written notice shall be assessed."
Subdivision (c) provides, "In addition to the penalties set forth in subdivision (b), the gross revenues from the unauthorized advertising display . . . shall be disgorged."

$1 million in revenue for the City in 2014, and it helped fund the graveyard shift of the City's police department.

D.     *Disputed Evidence at the Administrative Hearing*

Sky Posters's requests for hearing were consolidated, and a five-day hearing before an administrative law judge (ALJ) commenced on July 6, 2015.[10]  Representatives of the City, Caltrans, Sky Posters, and Sky Posters's contractors testified. The principal disputed issue was whether the displays qualified as redevelopment displays under section 5273.  Caltrans outdoor advertising inspector Raj Champaneri opined that if the displays qualified as redevelopment displays under section 5273, they would not be in violation of the OAA.

1.     *The X-Men display and Inglewood Tickets*

Inglewood city planner and economic and community development manager Christopher Jackson was responsible for approving the advertising copy and plans for each of Sky Posters's proposed displays and for making the City's annual certifications to Caltrans.[11]  Jackson testified there were no

[10]     ALJ Erlinda G. Shrenger with the Department of General Services Office of Administrative Hearings presided over the hearing and issued the proposed decision.

[11]     The City sent letters to Caltrans certifying that as of December 31, 2013 and December 31, 2014, Sky Posters's displays were "advertising business[es] or activities within the boundary of the Merged Inglewood Redevelopment Project Area and that at least 10 percent, up to a maximum of 100 square feet, is used to display the address or location or locations of the advertised business(es) or activity(ies) . . . ."

businesses within the redevelopment project area that showed first-run movies, but Inglewood Tickets was located within the redevelopment project area and sold tickets to new movies. Jackson made this determination by calling the owner of Inglewood Tickets at some point prior to approving the X-Men display and asking if tickets to new movies could be purchased at the business. Jackson then visited Inglewood Tickets and found a kiosk from which first-run movie tickets were available for sale.

Jerod Helt, a permit expediter retained by Sky Posters to obtain approvals for the displays, testified that sometime after Senate Bill 684 was passed in October 2013 he visited Inglewood Tickets and took photographs of the kiosk, which he described as "a computer in the lobby, and you could use that computer to order the tickets." The photographs were admitted into the administrative record. The photographs show a two-story commercial building with an awning stating "CONCERT · THEATRE · SPORTS" and a marquee listing musical performers, a music festival, and two professional basketball teams. A photograph of the interior of the ticket window for Inglewood Tickets shows a service counter with a glass divider; sitting on the counter on the public side of the divider stands a computer with an advertisement for the movie "The Secret Life of Walter Mitty" as its desktop wallpaper.

Champaneri, who issued the notices of violation, testified he was not aware at the time he recommended action against the X-Men display that the display included a tagline identifying

Inglewood Tickets on the bottom corner.[12]  Champaneri stated Inglewood Tickets did not sell movie tickets.  When asked how he knew this, Champaneri said he contacted the business, although he did not recall when, nor did he elaborate.  Presented with a series of hypothetical scenarios, Champaneri opined, "If the tickets are available at that place, then I would think that qualifies under the redevelopment criteria."

McNeilly (Sky Posters's president) testified Inglewood Tickets had not paid anything to Sky Posters; instead, the movie studio or its media agency paid for the X-Men display.  McNeilly had a "handshake type of an agreement" with the owner of Inglewood Tickets approving Sky Posters's use of the business name on its displays, and the owner of Inglewood Tickets was "very excited" to have the "free advertisement."

2.    *The Nissan display and CarMax*

Jackson testified that before approving the Nissan display, he determined the Inglewood CarMax facility was within the redevelopment project area and that CarMax sold model-year Nissans.  Jackson made the latter determination by visiting the CarMax website, which indicated it was possible to purchase a new Nissan through CarMax.  When asked, "Did you look up to see if the Inglewood location carried the Nissan Rogue for the

---

[12]     Champaneri took the photographs of the X-Men display that were included with the violation notice.  The Inglewood Tickets location tagline is not visible in the bottom right corner of the display in Champaneri's photographs, but it is visible in the photographs introduced by Sky Posters.  Sky Posters argued the display was still being erected and was incomplete when Champaneri photographed it.

2015 year?," Jackson answered, "No." However, Jackson requested an opportunity to clarify his answer, stating he "[d]idn't understand," and when asked, "Did you ever confirm on the CarMax website whether or not the Inglewood location carried brand-new 2015 Nissan Rogues?" he answered, "Yes." Jackson did not print out the results of his website research.

Helt testified he visited the CarMax website and the CarMax Inglewood facility during the week of the administrative hearing (in July 2015) to determine whether it sold new Nissan cars, and he concluded it did. A composite of multiple images placed on a single page that Helt testified he captured from the CarMax website was admitted at the hearing. The images show a CarMax webpage with a pull-down menu labeled "Find a Car" that listed "Used Cars," "New Cars," "All Cars," and "Nationwide Transfers."[13] At the bottom of the webpage was a "Contact Us" tab that stated, "Contact LAX in Los Angeles" and "Visit Us," and listed the Inglewood CarMax's address. The composite also includes a photograph of a 2015 Nissan Rogue sitting in a parking lot with a manufacturer's window sticker, but Helt did not testify where on the CarMax website he found the image and whether the vehicle shown was available at the Inglewood facility.

During his July 2015 visit to the Inglewood CarMax facility, Helt took photographs of the vehicles on the lot, and a composite of the photographs was also admitted. The

---

[13] Caltrans submitted a printout of a CarMax web page which Helt agreed was consistent with what he had found online when searching for new cars. Helt acknowledged the printout indicated only that new Nissans were available at a CarMax facility in Washington, D.C. and Maryland.

photographs show at least five Nissan vehicles on the Inglewood lot, and Helt testified the lot's inventory included model year Nissan Rogues. However, the only close-up photograph of a vehicle at the Inglewood facility shows a "Carmax quality certified" window sticker on a 2015 Nissan Altima. Helt testified he had also visited the Inglewood CarMax on several prior occasions, but he did not recall if he visited the facility in March or April 2014. Helt recounted that on a previous occasion, Jackson had asked him to call CarMax before installing an advertising display for a Chrysler vehicle, and Helt called the facility the same day and confirmed it had the advertised Chrysler on the lot.

Champaneri testified he determined there were no Nissan dealerships and no new Nissan Rogue vehicles available for sale in the redevelopment project area. His determination was based on calls with the City and his own online research. Champaneri also photographed the CarMax facility's sign adjacent to Interstate 405, which stated, "Car Max [¶] Used Cars [¶] Exit Manchester." (Capitalization Omitted.)

McNeilly testified that either Nissan or its media agency, not CarMax, paid for the Nissan display. The contract between Sky Posters and Nissan or its agency would not have expressly provided that Sky Posters intended to place a CarMax location tagline on the Nissan display, but Sky Posters would have informed the advertiser. Sky Posters did not have a written agreement with CarMax, but McNeilly was informed that CarMax verbally approved the use of its name on Sky Posters's displays for vehicle advertisements.

14

E.     *The Administrative Decision*

On December 23, 2015 the ALJ issued a 20-page proposed decision, which Caltrans adopted as its final decision on January 21, 2016 (the administrative decision).  The ALJ found that in issuing the violation notices, "Champaneri concluded that the [s]ubject [d]isplays were not redevelopment displays advertising businesses in the City's redevelopment zone.  In his investigation, Champaneri did not find a Nissan dealership, or a movie theater that showed first-run movies . . . ."  However, "Jackson approved the permit for the Nissan display after his review and research concluded that the display was for an advertisement for a business within the Inglewood redevelopment zone, namely Carmax. . . .  Jackson also reviewed Carmax's website and confirmed that new cars (i.e., model year vehicles) could be purchased through Carmax."  As to the X-Men display, Jackson did not locate any businesses that showed first-run movies in the redevelopment project area, but he found a business "that sold movie tickets, namely, Inglewood Tickets.  Jackson contacted the owner of Inglewood Tickets, who confirmed that Inglewood Tickets sold movie tickets through a kiosk at its location."

The ALJ found the evidence did not support Sky Posters's contention its displays qualified as redevelopment displays under section 5273, subdivision (a), because, although they included taglines showing the names and addresses of Inglewood Tickets and CarMax, "[t]he taglines are visually dwarfed by the more prominent and conspicuous images and text for the X-Men movie and Nissan Rogue.  Looking at the totality of each of the [s]ubject [d]isplays, it is clear that what is being advertised or promoted to passing motorists traveling on the 405 freeway is a first-run X-Men motion picture and a model-year Nissan Rogue.  Neither of

15

the [s]ubject [d]isplays can reasonably be construed as advertising for Inglewood Tickets or Carmax, or the availability of movie tickets and Nissan vehicles for sale at those respective businesses." Sky Posters's contention was "further undermined by the fact that neither of those businesses paid to have their names and addresses advertised on the [s]ubject [d]isplays. . . . There was no agreement between [Sky Posters] and Inglewood Tickets or Carmax, to advertise the latter two businesses on [Sky Posters's] super graphic wall signs placed on the [b]uilding." The ALJ also found the displays did not qualify as on-premises displays exempt from the OAA under section 5272, subdivision (a)(4). She found, "The weight of the evidence does not support [Sky Posters's] contention that the [s]ubject [d]isplays advertise movie ticket for sale at Inglewood Tickets . . . , or cars that are available for sale at Carmax."

The ALJ affirmed the violation notices and ordered Sky Posters to pay $10,300 in penalties for the Nissan display under section 5485, subdivision (b)(2), comprised of a penalty of $10,000 for failure to remove the display within 30 days of the violation notice, plus $100 for each additional day the display remained. No penalties were imposed as to the X-Men display because it was removed within 30 days of the violation notice. However, the ALJ ordered Sky Posters, pursuant to section 5485, subdivision (c), to disgorge $129,868 in revenue it received from the X-Men display. There was insufficient evidence to establish the gross revenue Sky Posters received from the Nissan display, and thus, no disgorgement was ordered as to that display.

The ALJ also made findings, not at issue on this appeal, that Sky Posters's placement of 20 subsequent displays on the building were substantially similar to the subject displays, and

16

Caltrans was not required to issue a notice of violation for each change in advertising copy. Sky Posters received approximately $2.1 million in gross revenue for those displays, of which 40 percent was paid to the City. The ALJ therefore ordered Sky Posters to disgorge 60 percent of those revenues, totaling approximately $1.3 million.

Sky Posters filed a petition for reconsideration, arguing in part that the ALJ effectively adopted a new standard for qualification as a redevelopment display that was impermissibly vague and inconsistent with section 5273, and further, the disgorgement order was improper because the subsequent advertising displays were not properly at issue. After a hearing before Jasvinderjit Bhullar, Caltrans's division chief for traffic operations, on February 27, 2018 Caltrans affirmed the administrative decision and adopted the proposed decision as its final decision.

F.     *Petition for Writ of Administrative Mandate*

On April 30, 2018 Sky Posters filed a petition for writ of administrative mandate challenging the administrative decision. Sky Posters alleged the Nissan and X-Men displays were lawfully permitted redevelopment displays and the administrative decision was contrary to law. In its supporting memorandum, Sky Posters argued the ALJ failed to analyze whether the displays met the criteria set forth in section 5273 and instead based her decision upon her findings the business location tagline was "'visibly dwarfed'" by the images and text for the advertised product, and the local businesses did not pay for the advertisements. Sky Posters asserted the "'visibly dwarfed'" standard was directly contrary to section 5273, subdivision (d),

17

which specifies only that "10% of the advertising copy, up to a maximum of 100 square feet, be used to display the address or location" of the local business. Sky Posters also challenged the disgorgement order.

In its opposition, Caltrans argued the plain meaning of section 5273, subdivision (d), was that the business location tagline must both take up at least 10 percent of the advertisement *and* not exceed 100 square feet; thus, "an advertisement within this section cannot be more than 1,000 square feet." Caltrans also argued the ALJ's analysis whether the Nissan and X-Men displays qualified as redevelopment displays was consistent with the analysis employed by the Court of Appeal in *People ex rel. Dept. of Transportation v. Maldonado* (2001) 86 Cal.App.4th 1225, 1229 (*Maldonado*) to determine whether a billboard was an on-premises display exempt from the OAA under section 5272. The court in *Maldonado* concluded the businesses advertised on the display did not conduct business on the property where the display was located, or the activities conducted on the property were merely incidental to the advertised businesses, and thus, the display did not qualify as an on-premises display. (*Id.* at pp. 1231-1232, 1235.)

After a hearing, on October 24, 2019 the trial court granted the petition in part, directing Caltrans to set aside the disgorgement order for the 20 displays installed after the X-Men and Nissan displays were removed. The court denied the petition in all other respects, accepting Caltrans's interpretation of section 5273, subdivision (d). The court explained, "[I]t says at least 10%, up to a maximum of 100 square feet. These are minimum and maximum conditions and both conditions must be

18

met. There must be at least 10% of the square footage devoted to the tagline and the tagline can be a maximum of 100 square feet. A tagline that is less than 10% of the sign but is 100 square feet does not qualify as a redevelopment display." (Underlining omitted.) Further, "[t]his plain meaning interpretation is consistent with the purpose of the [OAA], which is to regulate off-premise advertising displays. . . . Section 5273 authorizes signs in a redevelopment area that direct freeway travelers to a redevelopment business or activity. This purpose is not served if the tagline were permissibly a small part of a large sign. Indeed, redevelopment signs could swallow the [OAA]'s regulation of off-premise signage in redevelopment areas, as [Sky Posters's] signs did in this case."

The trial court also found substantial evidence supported the ALJ's finding the displays did not meet section 5273's criteria for advertising businesses and activities within the redevelopment project area because the location taglines were "'visibly dwarfed'" by the advertisements for the X-Men movie and Nissan Rogue; neither Nissan or the movie's distributor had business in the redevelopment area; and CarMax and Inglewood Tickets did not pay to have their names advertised. The court reasoned, "It is not enough to say in a tagline that a product can be purchased locally. There is no difference between Sky Posters's argument that the car and movie tickets may be purchased at local CarMax and Inglewood Tickets, respectively, and a billboard advertising Milky Way candy bars with a tagline that they can be purchased at a local grocery store. The billboard is advertising the product (Milky Way), not the location where it can be purchased. This does not meet section 5273(a)'s requirement of a sign advertising the businesses and activities of

19

the redevelopment area." Further, analogizing to *Maldonado, supra*, 86 Cal.App.4th at page 1231, the trial court concluded "[t]he fact that tickets for the X-Men movie and the Nissan car model may be purchased from a local business does not make the sign's advertisement of the movie and car into a redevelopment display."

On January 9, 2020 the trial court entered a judgment granting a peremptory writ of mandate as to the disgorgement order, but denying the writ as to the ALJ's determination the redevelopment displays did not qualify as on-premises displays under sections 5272 and 5273. Sky Posters timely appealed.

## DISCUSSION

A. *Standard of Review*

Code of Civil Procedure section 1094.5 provides for judicial review of administrative orders and decisions. (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514; *Schmid v. City and County of San Francisco* (2021) 60 Cal.App.5th 470, 483 (*Schmid*).) "'Pursuant to Code of Civil Procedure section 1094.5, subdivision (b), "[t]he inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence."'" (*Schmid*, at pp. 483-484; accord, *Doe v. University of Southern California* (2018) 28 Cal.App.5th 26, 34.) The writ petitioner has ""'the burden of proving that the

agency's decision was invalid and should be set aside, because it is presumed that the agency regularly performed its official duty."'" (*Schmid*, at p. 484.)

"On appeal from the judgment on a petition for writ of administrative mandate in a case not involving fundamental vested rights[14] . . . we review the agency's findings, not the superior court's decision, for substantial evidence." (*Doe v. University of Southern California, supra*, 28 Cal.App.5th at p. 34; see *Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055, 1072 ["'An appellate court in a case not involving a fundamental vested right reviews the agency's decision, rather than the trial court's decision, applying the same standard of review applicable in the trial court.'"].) However, we

---

[14] Where an agency decision affects the petitioner's fundamental vested right, the trial court exercises independent judgment in assessing whether the evidence is sufficient to support the agency's findings. (*Schmid, supra*, 60 Cal.App.5th at p. 484; *Young v. City of Coronado* (2017) 10 Cal.App.5th 408, 418.) Sky Posters does not challenge the trial court's determination Sky Posters's "economic interest in the permits to erect [the subject] redevelopment displays is insufficient to create a vested fundamental right" and its "primary business is in selling posters, not advertising, and Caltrans'[s] decision would not drive it out of business or significantly injure its ability to function." (See *JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1061 ["'Administrative decisions which result in restricting a property owner's return on his property, increasing the cost of doing business, or reducing profits are considered impacts on economic interests rather than on fundamental vested rights.'"].) We agree Sky Posters did not have a fundamental vested right in maintenance of the redevelopment displays.

independently review legal determinations by the agency or the trial court. (*Schmid, supra*, 60 Cal.App.5th at p. 485 ["legal issues present a question of law that this court reviews de novo on appeal"]; *Valero Refining Co.—California v. Bay Area Air Quality Management District Hearing Board* (2020) 49 Cal.App.5th 618, 637 ["In reviewing an agency's decision on a question of law ""the trial and appellate courts perform essentially the same function, and the conclusions of the trial court are not conclusive on appeal.""""].)

B.     *The Trial Court Erred in Interpreting Section 5273, Subdivision (d), To Limit the Size of Redevelopment Displays*

Sky Posters contends the trial court erred in adopting Caltrans's interpretation of the requirement in section 5273, subdivision (d), that the tagline for the location of the business be "at least 10 percent of the advertising copy, up to a maximum of 100 square feet," to mean the business location tagline must be at least 10 percent of the size of the advertisement *and* be no more than 100 square feet, thereby limiting the redevelopment display to 1,000 square feet. The plain meaning of section 5273, subdivision (d), supports Sky Posters's position the statute imposes no such limit, as does the statutory context and legislative history.

"We review questions of statutory construction de novo." (*California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1041; accord, *Wang v. City of Sacramento Police Department* (2021) 68 Cal.App.5th 372, 378.) "As with any question of statutory construction, our core task here is to determine and give effect to the Legislature's

22

underlying purpose in enacting the statutes at issue. [Citations.] We first consider the words of the statutes, as statutory language is generally the most reliable indicator of legislation's intended purpose. [Citation.] We consider the ordinary meaning of the relevant terms, related provisions, terms used in other parts of the statute, and the structure of the statutory scheme. [Citation.] If the relevant statutory language is ambiguous, we look to appropriate extrinsic sources, including the legislative history, for further insights." (*McHugh v. Protective Life Ins. Co.* (2021) 12 Cal.5th 213, 227; accord, *Jarman v. HCR ManorCare, Inc.* (2020) 10 Cal.5th 375, 381.)

In construing a statute, we give deference to an agency's interpretations of the statutory language "to the extent that those interpretations are embodied in quasi-legislative regulations or constitute long-standing, consistent, and contemporaneous interpretations." (*McHugh, supra*, 12 Cal.5th at p. 227, citing *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7 ["[U]nlike quasi-legislative regulations adopted by an agency to which the Legislature has confided the power to 'make law,' and which . . . bind this and other courts as firmly as statutes themselves, the binding power of an agency's *interpretation* of a statute or regulation is contextual: Its power to persuade is both circumstantial and dependent on the presence or absence of factors that support the merit of the interpretation."]; see *Maldonado, supra*, 86 Cal.App.4th at p. 1232 ["As the agency charged with administration of the [OAA], Caltrans's construction thereof is entitled to great weight."].)

We read the statutory language "at least 10 percent of the advertising copy, up to a maximum of 100 square feet" in a

commonsense manner to set the maximum required size of the business location tagline (100 square feet) regardless of the display's size. The use of commas surrounding the phrase "up to 100 square feet" indicates the phrase modifies the antecedent phrase, "at least 10 percent." Thus, the business location tagline must be at least 10 percent of the advertising copy, but the tagline is not required to be larger than 100 square feet. Accordingly, both the 30,000-square-foot Nissan display and the 25,000-square-foot X-Men display were required to have at least a 100 square-foot business location tagline, as would any display that is 1,000 square feet or larger.

Section 5273, subdivision (d), cannot reasonably be interpreted as imposing a 1,000 square foot overall size limit on redevelopment displays. Had the Legislature intended to limit redevelopment displays to 1,000 square feet, it could have simply said so directly in section 5273, subdivision (d), rather than indirectly by applying a mathematical constraint, specifically, requiring the use of algebra to calculate that a 100 square-foot tagline can only meet the 10 percent requirement if the entire display is no larger than 1,000 square feet. (See, e.g., *Unisys Corp. v. California Life & Health Ins. Guarantee Assn.* (1998) 63 Cal.App.4th 634, 639 [rejecting proposed interpretation of coverage exclusions from a provision of the Life and Health Insurance Guaranty Act that constituted "a remarkably convoluted way for the Legislature to make a point that could readily be stated with utmost clarity"].)

Moreover, Caltrans has not adopted regulations or an agency interpretation of section 5273, subdivision (d), that imposes a 1,000 square-foot limitation on redevelopment displays. Notably, Caltrans never asserted in the violation

24

notices, accusation, hearing briefs, or administrative review process that the Nissan and X-Men displays—30,000 and 25,000 square feet, respectively—violated the OAA because they exceeded 1,000 square feet. To the contrary, Champaneri testified in response to several hypothetical questions that had the subject displays identified a Nissan dealership or a first-run movie theater, the displays would qualify under the criteria for a redevelopment display.

The legislative history of section 5273 supports our interpretation. Prior to enactment of Senate Bill 684 in 2013, section 5273 did not include any provision addressing the size or content of the required business location tagline, and it did not limit the overall size of redevelopment displays. As described in the Senate Rules Committee's analysis of Senate Bill 684, under the then-existing framework, "[t]he [OAA] regulates the size, illumination, orientation, and location of advertising displays adjacent to and within specified distances of interstate or primary highways," but "[l]ocal government regulates on-premise displays, except for certain safety requirements." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 684 (2012-2013 Reg. Sess.) as amended May 15, 2013, pp. 2-3.) According to the Senate Rules Committee's analysis, Senate Bill 684 was designed to amend the redevelopment agency exemption to the OAA to address the elimination of redevelopment agencies and "[p]lace[] the responsibility on the designated successor agency for ensuring these advertising displays are advertising qualifying businesses, are otherwise being operated lawfully, and remain in the public's best interest." (*Ibid*.) Nowhere in the legislative history is there a discussion of

25

an intent to impose a statewide limitation on the overall size of a redevelopment display.

The trial court reasoned that its interpretation of section 5273, subdivision (d), was consistent with the broader purpose of the OAA in controlling signage on freeways, and "[t]his purpose is not served if the tagline were permissibly a small part of a large sign." Although it is true that a miniscule business location tagline would not advance the goal of Senate Bill 684 to direct traffic to the redevelopment businesses,[15] it is reasonable to assume the Legislature believed a 100 square foot tagline was sufficiently large to accomplish that goal. Further, we recognize that Sky Posters is utilizing a loophole created by section 5273, which allows redevelopment displays to qualify as on-premises displays not subject to the OAA even though they are not on the premises, while the same displays if located near the highway but not in the redevelopment zone (and not on the premises) would be governed by the OAA. But it is not for us to second guess the Legislature's intent in 1985 to create an exception for redevelopment displays to qualify as on-premises

---

[15] The Senate Rules Committee Analysis of Senate Bill 684 states, "According to proponents, legislation created the redevelopment exemption to the OAA to allow businesses in these less-desirable places to advertise for two reasons. First, travelers on the landscaped freeway who may have been reluctant to frequent the businesses in the area because of the perceived blight would consider doing so as redevelopment investment helped address the blight issues. Second, this new advertising opportunity could be an additional tool to help a struggling business in the project area become more successful." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 684 (2012-2013 Reg. Sess.) as amended May 15, 2013, p. 3.)

displays as long as they advertised businesses or activities in the redevelopment project area and the redevelopment agency consented to the display, then to modify the exception in 2013 to set minimum requirements for the size of the tagline identifying the business location.[16]

C.    *The ALJ Used an Erroneous Legal Standard To Determine Whether the Displays Advertised a Business in the Redevelopment Project Area*

Sky Posters contends the ALJ and the trial court, in focusing on the size of the business location tagline and overall display, failed to apply the correct legal standard under section 5273, which required the ALJ to determine whether the products and services advertised on the X-Men and Nissan

---

[16]    In 2016 the Legislature adopted Senate Bill No. 1199 (2015-2016 Reg. Sess.) (Stats. 2016, ch. 869, § 1, p. 2.), adding section 5273.1 to the OAA.  The new section applies only to advertising displays "adjacent to Interstate 405 and located at either postmile 22.36L or 22.38L north of Century Boulevard"— the precise location of the subject displays.  (§ 5273.1, subd. (a)(3).)  It provides that displays advertising "businesses and activities within the boundary limits of the City of Inglewood may continue to exist and advertise businesses or activities operating outside the redevelopment project area."  (§ 5273.1, subd. (a).)  As described in the Senate Rules Committee's analysis of Senate Bill No. 1199, "[i]f this bill were passed, Sky Posters would likely be permitted to continue displaying the two wall posters at issue."  (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1199 (2015-2016 Reg. Sess.) as amended April 26, 2016, p. 4.)  The bill was adopted before Caltrans asserted section 5273, subdivision (d), limits the size of redevelopment displays to 1,000 square feet.

27

displays were sold in the redevelopment zone.  Sky Posters is partially correct.  We read section 5273 to require the advertised products and services be sold in the redevelopment project area, but in addition, their sale must not be merely incidental to the business located in the redevelopment project area.  The ALJ failed to make these findings.

Multiple sections of the OAA and related statutes support our construction.  As discussed, section 5273, subdivision (a), classifies "an advertising display advertising the businesses and activities developed within the boundary limits of, and as a part of, an individual redevelopment agency project" as an "on-premises display, as defined in Section 5490."  Section 5490, subdivision (b)(2), in turn, defines an "on-premises advertising display[]" to include a display intended "[t]o advertise the business conducted, services available or rendered, or the goods produced, sold, or available for sale, upon the property where the advertising display has been lawfully erected."  And section 5272, subdivision (a)(4), exempts from regulation under the OAA on-premises displays that are used "exclusively" to advertise "the business conducted, services rendered, or goods produced or sold upon the property on which the advertising display is placed."

In harmonizing these provisions, we construe section 5273, subdivision (a), to extend the perimeter of the area in which a display is considered an on-premises display from the actual location of the display to the entire redevelopment project area, as long as the display meets the requirements of section 5273 for a redevelopment display and those of an on-premises display

28

under section 5272 (consistent with section 5490).[17] (See *Leider v. Lewis* (2017) 2 Cal.5th 1121, 1135 ["We construe terms in

[17] We invited the parties to file supplemental letter briefs addressing the significance, if any, of the difference between section 5272's inclusion as an on-premises display of an advertising display that advertises "the business conducted, services rendered, or goods produced or sold upon" a property, and section 5273's inclusion as an on-premises display of a redevelopment display that advertises "the businesses and activities developed within" a redevelopment project area, and further, whether the Legislature intended by using the language in section 5273 to narrow the scope of advertising displays that qualify as on-premises displays. Caltrans stated in its supplemental letter brief, consistent with the position of Sky Posters, that "section 5273 did not intend to create a narrower definition of on-premises displays as defined in section 5272." We agree. Although the language in section 5273 differs slightly from that in section 5272 (referring to "activities" instead of "services rendered" and "goods produced or sold upon"), there is no indication in the legislative history of Senate Bill No. 897 (1985-1986 Reg. Sess.), which added section 5273, or Senate Bill 684 (2013-2014 Reg. Sess.), which in 2013 amended section 5273, that the Legislature intended to modify the requirements for an advertising copy to qualify as an on-premises display. Rather, the legislative history reflects only a legislative intent to expand the boundaries of where an advertising display may be placed (in the entire redevelopment project area) to qualify as an on-premises display. As the Senate Rules Committee's analysis of Senate Bill No. 897 explained, the bill constituted "a relaxation of current law, which permits such signs only if they advertise businesses or activities conducted immediately upon the property where the display is located." (Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished Business Analysis of Sen. Bill No. 897 (1985-1986 Reg. Sess.) as amended by Assembly Sept. 9, 1985, p. 2.)

context, harmonizing the statutes both internally and with each other to the extent possible"]; *Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 805 ["'A court must, where reasonably possible, harmonize statutes, reconcile seeming inconsistencies in them, and construe them to give force and effect to all of their provisions'"].)

Moreover, because Caltrans is the entity charged with administration and enforcement of the OAA (§ 5250), its construction of the requirements for an on-premises display under section 5272 is entitled to substantial weight. (*Maldonado, supra*, 86 Cal.App.4th at p. 1232; see *McHugh, supra*, 12 Cal.5th at p. 227.) Under Caltrans's implementing regulations for on-premises displays, a display does not qualify as an on-premises display under section 5272 if the display "advertises a brand name, trade name, product or service only incidental to the principal activity conducted on the property, or from which the business or property owner derive rental income." (Cal. Code Regs., tit. 4, § 2243, subd. (c).)

*Maldonado, supra*, 86 Cal.App.4th at pages 1230 to 1231, which interpreted the comparable provisions for on-premises advertising along landscaped freeways under sections 5440 and 5442 of the OAA, is instructive.[18] There, the Court of Appeal considered whether a billboard with advertisements placed on the roof of an office building qualified as an allowable on-premises display where the advertised businesses leased small

---

[18] Section 5442, subdivision (c), exempts specified advertising displays on landscaped freeways from regulation under section 5440 if the advertising display is used exclusively "[t]o advertise goods manufactured or produced, or services rendered, on the property upon which the advertising display is placed."

offices in the building but did not sell the advertised products in the building.  (*Id.* at p. 1229.)  The court explained that "[w]hether a sign is a permissible outdoor advertising display is not determined by the subjective intent of the property owner but is a conclusion drawn from objective facts."  (*Id.* at 1231.)  In reviewing the facts presented in the Caltrans abatement action at issue, the court considered whether the advertisers met the requirements for a permissible advertising display under section 5542, subdivision (b) (that the display designate the "occupant of the premises upon which the advertising display is placed"), or subdivision (c) (that the display be used exclusively "[t]o advertise goods manufactured or produced, or services rendered, on the property upon which the advertising display is placed"), by applying the Caltrans regulation that requires the display not advertise a "product or service only incidental to the principal activity conducted on the property."  (*Maldonado*, at pp. 1230-1232, quoting Cal. Code Regs., tit. 4, § 2243, subd. (c).)

The *Maldonado* court found the advertisements at issue—for a hotel, athletics team, cellular service company, and a jeweler—did not advertise on-premises businesses or their products or services because only two of the advertisers utilized leased office space in the building; the two used the space for purposes unrelated to the advertisements; and the advertised goods and services were not available for purchase in the building.  (*Maldonado, supra*, 86 Cal.App.4th at p. 1231.)  For example, the court concluded as to the advertisement by Stanford University for its football season, "The billboard advertised the Stanford football season and contained a telephone number for the ticket office at the football stadium . . . .  [But] Stanford did not operate a ticket office in its office in appellant's building."

31

(*Id*. at p. 1229.) As the court explained, "Patently conveyed in the language of the [OAA] is the requirement that there be a direct, ongoing, substantial relationship between the advertisement and the property on which it is located, so that people visiting the building will be able to obtain therein the goods and/or services in the advertisement. (*Id*. at p. 1232.) The court issued an injunction prohibiting the building owner from displaying advertising "'for products or services which are only incidental or secondary to the principal business activity conducted on [his] premises.'" (*Id*. at 1234.)

We apply the approach in *Maldonado* to redevelopment displays under section 5273, subdivision (a), and conclude under that section and Caltrans's implementing regulations, a redevelopment display only qualifies as an on-premises display exempt from the OAA requirements if the display advertises businesses or activities within the redevelopment project area that are not "incidental or secondary to the principal business activity" of the business. (*Maldonado, supra*, 86 Cal.App.4th at p. 1234; see Cal. Code Regs., tit. 4, § 2243, subd. (c).)

The ALJ failed to engage in the proper analysis here. Instead of analyzing whether the sale of model-year Nissans was incidental to CarMax's Inglewood business or whether the sale of X-Men tickets was incidental to Inglewood Tickets' business, the ALJ instead concluded only that the taglines identifying Inglewood Tickets and CarMax were not sufficiently large to qualify the subject displays as on-premises displays because the location taglines were "visually dwarfed by the more prominent and conspicuous images and text for the X-Men movie and Nissan Rogue," and "looking at the totality of each [display], it is clear that what is being advertised or promoted to passing motorists

32

traveling on the 405 freeway is a first-run X-Men motion picture and a model-year Nissan Rogue."

Moreover, as Sky Posters argues, the ALJ's analysis draws a categorical distinction between the business (allowed on a redevelopment display) and the products or services sold at the business (allowed only if they do not predominate the advertising copy). Such a categorical distinction does not find support in the statutes or *Maldonado*. Under the logic of the administrative decision, it would make no difference if the location tags had instead identified a Nissan dealership and a movie theater showing "X-Men," because the lion's share of the advertising copy focused on the products and their trademarks rather than the businesses. But new movie advertisements and new vehicle advertisements (as services or goods produced or sold) are not merely incidental or secondary to the principal business activity conducted on the premises of first-run movie theaters and Nissan dealerships. (*Cf. Maldonado, supra*, 86 Cal.App.4th at pp. 1231-1232 [Stanford did not operate a ticket office on the premises of the billboard advertising its football games].)

In affirming the ALJ's analysis, the trial court reasoned there was no difference between the Nissan and X-Men displays and "a billboard advertising Milky Way candy bars with a tagline that they can be purchased at a local grocery store." We do not find this analogy persuasive. A closer analogy to the present case would be a billboard advertisement for a signature sandwich with a tagline directing motorists to a national fast-food franchise in the redevelopment project area. To prove a violation, Caltrans would need to show the promotion of the sandwich was secondary or incidental to the local franchise restaurant's business, which would depend on whether the sale of the sandwich was related to

33

the core function of the business. One relevant factor would be whether the promotion or consumer traffic generated by the promotion was of economic significance to the local franchise restaurant. If the fast-food franchise was in the business of selling sandwiches, or if the sale of sandwiches generated a significant percentage of the franchise's sales, the promotion would likely not be secondary or incidental to the franchise's business.[19]

D.      *The ALJ Must Make Findings Under the Correct Legal Standard for a Redevelopment Display*

The ALJ failed to make findings sufficient to adjudicate whether the subject displays qualified as redevelopment displays under the correct legal standard. Because the ALJ applied the wrong standard, we cannot infer any findings in support of the administrative decision. As the Supreme Court explained in *Topanga Assn. for a Scenic Community v. County of Los Angeles, supra,* 11 Cal.3d at page 515, "[I]mplicit in section 1094.5 is a requirement that the agency which renders the challenged decision must set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order. . . . Reference, in section 1094.5, to the reviewing court's duty to compare the evidence and ultimate decision to '*the*

---

[19]      The ALJ's analysis was also erroneous to the extent it placed significance on the fact CarMax and Inglewood Tickets did not pay for the displays or enter into advertising contracts with Sky Posters. An advertisement on a display could be significant to a local business regardless of whether payment for the advertisement is made by, for example, a movie studio or automaker, instead of the local business.

34

*findings'* . . . leaves no room for the conclusion that the Legislature would have been content to have a reviewing court speculate as to the administrative agency's basis for decision." (Accord, *Saad v. City of Berkeley* (1994) 24 Cal.App.4th 1206, 1214 ["In *Topanga* . . . , the California Supreme Court announced that the findings requirement of Code of Civil Procedure section 1094.5 was real and that the reviewing courts should no longer imply findings to support the administrative determination where such findings were not made."].)

With respect to the Nissan display, the ALJ made findings that Caltrans inspector Champaneri investigated and found no Nissan dealerships in the redevelopment project area, while Jackson, the City's planner, "reviewed Carmax's website and confirmed that new cars (i.e., model year vehicles) could be purchased through Carmax." Neither of these findings addressed whether 2015 Nissan Rogues were available from the CarMax Inglewood facility in April 2014. Jackson gave inconsistent testimony as to whether he checked the CarMax website for the availability of Rogues or even new Nissans at the Inglewood location. Helt, Sky Posters's permit expediter, testified the Inglewood location sold 2015 Rogues at the time of the administrative hearing in July 2015, but his photographs of the CarMax website and the Inglewood facility are ambiguous, and they suggest new Nissans may only have been available from a different CarMax facility in Washington, D.C., or Maryland through an arrangement with a licensed Nissan dealership. The ALJ did not probe the nature of CarMax's Inglewood business or address the credibility of these witnesses and the contradictory testimony. To determine whether the sale of the new model-year Nissan Rogue was incidental or secondary to CarMax's business,

35

the ALJ, at a minimum, needed to make findings on whether the vehicle was available for sale at the Inglewood CarMax dealership.

With respect to the X-Men display, the ALJ made a finding Jackson investigated and determined that "Inglewood Tickets sold movie tickets through a kiosk at its location." However, Champaneri testified he had "contacted" Inglewood Tickets at some point and determined they did not sell first-run movie tickets. In addition to this conflicting testimony, the photographs of the facility, including the exterior marquee and interior lobby, suggest the business was primarily engaged in the sale of tickets to live events, and the kiosk for movie tickets may have simply been a computer set up in the lobby that visitors could use to buy movie tickets online. Findings relevant to the determination whether the X-Men display qualified as a redevelopment display would include not only whether X-Men tickets were available at the Inglewood Tickets facility, which seems technically to have been true in the same way they are available on any computer or smartphone, but also whether, for example, Inglewood Tickets generated commissions on the sale of new movie tickets through the kiosk or the kiosk generated significant business traffic for Inglewood Tickets such that ticket sales to new movies can fairly be deemed not to be secondary to its live-events ticket business.

## DISPOSITION

The judgment is reversed.  The matter is remanded with directions for the trial court to issue a writ directing Caltrans to set aside the administrative decision and to direct the ALJ to make findings whether products advertised on the subject displays were available for sale at the identified redevelopment businesses and whether their sale was secondary or incidental to the primary business of the redevelopment businesses.  The parties are to bear their own costs on appeal.

FEUER, J.

We concur:


PERLUSS, P. J.


SEGAL, J.

37